UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

A.J.W.,

                        Plaintiff,                              Court File No.  16-cv-2651 (SRN/LIB)

        v.                                                  **REPORT AND RECOMMENDATION**

Nancy A. Berryhill,
Commissioner of Social Security,

                        Defendant.

        Plaintiff A.J.W. ("Plaintiff"), a minor, by and through his parent and natural guardian S.J. ("Parent"), seeks judicial review of the decision of the Commissioner of Social Security ("Defendant") terminating Plaintiff's supplemental security income ("SSI") benefits. The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 7.2. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).

        The parties submitted cross-motions for summary judgment, [Docket Nos. 13 and 15], and the Court took the matter under advisement on the written submissions.

        For the reasons discussed below, the Court recommends that Plaintiff's Motion for Summary Judgment, [Docket No. 13], be **DENIED**, and Defendant's Motion for Summary Judgment, [Docket No. 15], be **GRANTED**.

## I.    PROCEDURAL HISTORY

        In May 2009, Parent filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act, on behalf of her 9-year-old son, Plaintiff. (Tr. 87, 116). On December 14, 2009, Defendant found that Plaintiff was disabled due to Borderline Intellectual

Function and Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. 87). Defendant found that Plaintiff had become disabled on May 5, 2009, and Defendant accordingly awarded Plaintiff SSI benefits. (Tr., 116, 195).

On May 16, 2014, after a routine review of Plaintiff's disability pursuant to 20 C.F.R. § 416.994a(a), Defendant concluded that due to medical improvement, Plaintiff was no longer disabled as of May 1, 2014. (Tr. 87, 89, 91). Accordingly, Defendant terminated Plaintiff's disability benefits. (Tr. 87, 89, 91).

Plaintiff requested reconsideration of the cessation decision, and on July 17, 2014, Disability Hearing Officer Deborah Keplar held a hearing on the request for reconsideration. (Tr. 96-97, 101, 113). Parent testified at the hearing, as did Plaintiff. (Tr. 114-15). The Hearing Officer issued her decision on July 18, 2014. The Hearing Officer concluded that there had been medical improvement in Plaintiff's condition since the December 14, 2009, decision (hereinafter referred to as the Comparison Point Decision, or the "CPD"[1]), and that Plaintiff was no longer disabled. (Tr. 120, 123).

Plaintiff next requested a hearing before an administrative law judge ("ALJ"), and ALJ Mary M. Kunz held an administrative hearing on November 14, 2014. (Tr. 33, 127). At the hearing, the ALJ heard testimony from Plaintiff, Parent, and Dr. Karen Butler, PhD., the state agency medical expert. (Tr. 38, 45, 59, 187). On December 8, 2014, the ALJ issued her Hearing Decision, in which she concluded that Plaintiff's disability ended as of May 1, 2014, and he had not become disabled again since that date. (Tr. 28).

Plaintiff requested review of the Hearing Decision by the Appeals Council. (Tr. 1). On June 10, 2016, the Appeals Council notified Plaintiff that his request for review was denied. (Tr.

---

[1] The "Comparison Point Decision," or "CPD," is the most recent medical determination that A.J.W. was disabled. See, (Tr. 12); see, also, 20 C.F.R. § 416.994a(a)(1).

1). As such, the December 8, 2014, ALJ Hearing Decision became the final decision of Defendant. See, 20 C.F.R. §§ 404.981, 416.1481.

On August 5, 2016, Plaintiff, by and through Parent, filed the present action. (Compl., [Docket No. 1]). The case was referred to the undersigned for report and recommendation by United States District Court Judge Susan Richard Nelson on the parties' cross-Motions for Summary Judgment. ([Docket Nos. 13 and 15]).

## II.    SEQUENTIAL ANALYSIS

Initially, the Court notes that the parties disagree as to the temporal scope of the evidence which the ALJ should have considered and which this Court should now review. An overview of the sequential analysis used to review disability benefits awarded to children is helpful to resolving this threshold issue.

If a child is found eligible for disability benefits, his or her continued eligibility must be reviewed from time to time. 20 C.F.R. § 416.994a(a). Upon such review, the ALJ first determines whether there has been any "medical improvement" in the child's condition since the Comparison Point Decision ("CPD"), which is the most recent favorable decision regarding benefits. 20 C.F.R. § 416.994a(b)(1). "Medical improvement is any decrease in the medical severity of [the child's] impairment(s) which was present at the time" of the CPD. 20 C.F.R. § 416.994a(c). "[T]he decrease in severity may be of any quantity or degree," but the ALJ must "disregard minor changes in [the child's] signs, symptoms, and laboratory findings that obviously do not represent medical improvement and could not result in a finding that [the] disability has ended." Id. If there has been no medical improvement, the ALJ must find that disability continues, unless a specific exception delineated in the applicable regulations applies. See, 20 C.F.R. § 416.994a(b)(1), (e), and (f).

3

If there <u>has</u> been medical improvement, however, the ALJ proceeds to the second step and considers whether the impairment or impairments previously identified and considered at the CPD still meet or equal the severity of the Listed impairment they met or equaled at the time of the CPD. 20 C.F.R. § 416.994a(b)(2). If so, the ALJ must find that disability continues; if not, the ALJ proceeds to the third step.

In the third step, the ALJ considers whether the child is currently disabled, considering all impairments the child now has, including any which the child did not have at the time of the CPD, or which were not considered at that time. <u>See</u>, 20 C.F.R. § 146.994a(b)(3). This determination of current disability requires its own additional three-part analysis. First, the ALJ determines whether the child currently has a severe impairment or combination of impairments. 20 C.F.R. § 416.994a(b)(3). A medically determinable impairment or combination of impairments is severe unless it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). If the child has a severe impairment or combination of impairments, the ALJ proceeds to the second part of the additional analysis, and the ALJ determines whether the child's impairment or combination of impairments meets or medically equals the severity of any impairment listed in 20 CFR Part 404, subpart P, Appendix 1. 20 C.F.R. § 416.994a(b)(3). If so, the ALJ must find that disability continues. If not, the ALJ proceeds to the third part of the additional analysis, and he or she determines whether the child's impairment or combination of impairments functionally equals a Listing. 20 C.F.R. § 416.994a(b)(3). If so, the ALJ must find that disability continues.

To "functionally equal the listings," the severe impairment or combination of impairments "must be of listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The

domains are: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A limitation is considered "marked" when the impairment or combination of impairments "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the child's impairment or combination of impairments "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

In other words, in considering whether a child whose previous disability has ended is nevertheless currently disabled, if the ALJ finds (1) that the child currently has no severe impairment or combination of impairments; or (2) that the child's impairment or impairments do not meet, medically equal, or functionally equal a Listing, the ALJ will find that the child is not currently disabled. 20 C.F.R. § 416.994a(b)(3)(i)-(iii).

## III. RELEVANT TEMPORAL SCOPE

In the case presently before this Court, Plaintiff does not challenge the ALJ's threshold finding that the impairments upon which the CPD was based had in fact improved to the point that they were no longer disabling as of May 1, 2014. (See, Plf. Mem, [Docket No. 14], 15-16). Nor does Plaintiff appeal the ALJ's finding that none of Plaintiff's current impairments met or medically equaled a Listing. (Id.). Rather, Plaintiff limits the issues in this appeal to whether the ALJ properly determined that Plaintiff did not, at the time of the ALJ's decision, have a severe impairment or combination of impairments that functionally equaled the Listings. (Id. at 15-32). The ALJ framed these findings as follows: "Since May 1, 2014, the claimant has not had an impairment or combination of impairments that functionally equals the listings." (Tr. 25).

Defendant argues that any evidence in the present record which is dated prior to May 1, 2014, is irrelevant to whether or not the ALJ's determination on this point was erroneous. (Def. Mem., [Docket No. 16], 8, 10-11). Plaintiff contends that the determination that his current impairments were not disabling as of May 1, 2014, should be based upon all prior evidence of impairments no matter their date. (Reply, [Docket No. 17], 5).

Neither party cites to any case law addressing the issue of the temporal scope of relevant evidence in a disability benefits cessation case where the only issues on appeal involve the third step of the ALJ's review process. Likewise, this Court's independent review has not discovered a case directly on point. Nevertheless, the plain language of the applicable regulations shows that evidence prior to May 1, 2014, may be relevant to determining whether, on December 8, 2014, Plaintiff had an impairment or combination of impairments that functionally equaled a listing.

Determining whether a minor claimant is currently disabled after a determination that a prior disability has ceased involves considering "all impairments [the child] now ha[s], including any [the child] did not have at the time of [the CPD], or that we did not consider at that time." (Emphasis added.) See, 20 C.F.R. § 146.994a(b)(3). In order for an ALJ to consider impairments that were in existence but were not considered at the time of the CPD, an ALJ might have to consider evidence from before or at the time of the CPD, which is by definition earlier in time than the date on which the disability caused by the impairments considered in the CPD ceased.

Moreover, a person under 18 years of age is disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (Emphasis added.) 20 C.F.R. § 416.906. In the instant case, less than 8 months passed between the cessation of

Plaintiff's previous disability—May 1, 2014—and the ALJ's December 8, 2014, Hearing Decision finding that Plaintiff was not currently disabled. Therefore, under 20 C.F.R. § 416.906, the ALJ was necessarily allowed to review at least 12 months of evidence some of which would necessarily come from prior to May 1, 2014. This Court will also do so herein.

## IV.    STATEMENT OF FACTS

### A.    Factual History and Reports from Parent

Plaintiff was born on March 2, 2000. (Tr. 88).

On May 19, 2009, as part of Plaintiff's initial application for disability benefits, Parent completed a Function Report about Plaintiff, who was 9 years old at the time. (Tr. 202-13). She indicated that Plaintiff's ability to progress in learning was limited, and he could not read, write in longhand, spell 3-4 letter words, write a simple story, add or subtract numbers over 10, or tell time. (Tr. 208). Plaintiff did not know the days of the week or the months of the year, and he could not make change. (Tr. 208). Plaintiff did not have friends his own age, he was unable to make new friends, he did not get along with adults or teachers, and he did not play team sports. (Tr. 210). Plaintiff could not dress or bathe himself independently, brush his teeth, eat independently with utensils, pick up after himself, follow directions, do chores, obey safety rules, or accept criticism or correction. (Tr. 211). Plaintiff had limited ability to pay attention and complete tasks. (Tr. 121).

On August 10, 2009, Parent completed a Disability Report regarding Plaintiff. (Tr. 214). This Disability Report contains very limited information, but it did identify Plaintiff's disabling conditions as depression, anxiety, learning disability, and ADHD, and Parent indicated that Plaintiff had been seen by professionals for these conditions. (Tr. 215).

On February 9, 2014, when Plaintiff was 14 years old, Parent completed a Function Report regarding Plaintiff. (Tr. 290). As relevant to the issues presently before this Court, Parent indicated that Plaintiff could not answer or make telephone calls, deliver phone messages, repeat stories he had heard, tell jokes accurately, or explain why he did things. (Tr. 293). Plaintiff could ask for what he needed, although he "may not know what he needs." (Tr. 293). Plaintiff could not read and understand comics, books, or newspapers; he could not multiply or divide numbers over 10; he could not make correct change; and he could not understand, carry out, or remember simple instructions. (Tr. 294). However, Plaintiff could spell words of more than four letters, tell time, and add and subtract numbers over 10. (Tr. 294). Plaintiff did not have friends his own age, he was unable to make new friends, and he did not generally get along with his siblings, although he usually got along with adults, including teachers, and he played team sports. (Tr. 295). Plaintiff took medication, he kept out of trouble, he sometimes obeyed rules, he avoided accidents, and he asked for help when needed, but he could not bathe himself, launder and put away his own clothes, help with household chores, cook his own meals, or accept criticism or correction. Plaintiff was unable to independently get to school on time, do homework, or use public transportation. (Tr. 296). His ability to pay attention and stick with a task was limited, and he had "major anxiety breakdowns at least [four times] per week." (Tr. 297).

### B.    Medical/ School Evidence in the Record

#### 1.    August 2006 to August 2007 (First Grade)

During his first-grade year, there were three disciplinary incidents involving Plaintiff. On September 13, 2006, he was suspended from school for allegedly assaulting a second-grade girl while on the bus. (Tr. 347). On October 25, 2006, Plaintiff was disciplined for not listening to his

teacher. (Tr. 346-47). On February 28, 2007, Parent participated in a parent-teacher conference after Plaintiff refused to do his work in class. (Tr. 346).

## 2. August 2007 to August 2008 (Second Grade)

Testing records show that from the time Plaintiff was in second grade through the fall of his eighth-grade year, he did not meet standardized goals for reading comprehension or math skills. (Tr. 325-27). During the fall of his second-grade year, Plaintiff received a grade of "below expectations" in reading and writing, and his math grade ("making progress toward expectations") was accompanied by teacher comments that Plaintiff had "shown growth," but despite working hard, Plaintiff was "not where he needs to be." (Tr. 231). Plaintiff's report card also noted that he needed to improve on working independently and completing his work on time. (Tr. 321). Plaintiff "met expectations" in science, social studies, health, and music classes. (Tr. 231).

On November 20, 2007, Dr. Craig S. Barron, PSy.D, L.P., administered the Wechsler Intelligence Scale for Children – IV ("WISC-IV") to Plaintiff "to assess his overall cognitive abilities." (Tr. 464). Plaintiff's full-scale score was 58. (Tr. 464).

> [Plaintiff] obtained a Verbal Scale score falling in the 1st percentile, which places him in the mild mentally retarded range of verbal abilities when compared to other individuals in his age group norms. This score emphasizes verbal language and verbal conceptual abilities. . . . .
> On the Performance Scale of the WISC-IV, [Plaintiff] scored within the mild mentally retarded range with his true score on tests on nonverbal abilities failing in the 0.2 percentile. . . . .
> Overall, [Plaintiff] demonstrated mild mentally retarded intellectual abilities on the WISC-IV. Further, he displays a cognitive style in which the ability to think in terms of visual images and manipulate them with fluency, flexibility and relative speed is as developed as the application of verbal skills to the solution of new problems.

(Tr. 465).

Dr. Barron noted there had been a representation that Plaintiff had a learning disability, but he further noted that "there is absolutely no evidence from the school available to review." (Tr. 465). Dr. Barron also recorded that Parent informed him that Plaintiff was "unable to bath[e] or change clothing without direction and supervision, frequently tantrums, and will cry if he does not get his way. Unfortunately, there is no other information available for review." (Tr. 465). Dr. Barron indicated that Plaintiff participated in family therapy in-home once per week, and he participated in individual therapy once per week at school. (Tr. 466). Parent informed Dr. Barron that Plaintiff "does not know how to do any chores whatsoever," but Dr. Barron noted that Plaintiff "did pickup [sic] toys in the examiner's office with no difficulty." (Tr. 467). Dr. Barron's diagnostic impression was probable mental retardation.[2] (Tr. 467).

On November 28, 2007, Plaintiff received a time-out at school after he refused to do his work and hid under his desk. (Tr. 346).

At some point during Plaintiff's second-grade year, Jamie Gable, his classroom teacher, referred Plaintiff to the special education team for an evaluation, citing concerns about Plaintiff's academic progress and his classroom behavior. (Tr. 229, 236). Gable reported that Plaintiff struggled with literacy and language arts, and he had difficulty expressing his thoughts, finding the right words, recalling oral information, and following written directions. (Tr. 235). At the time, Plaintiff received one-on-one guided reading for 15 minutes per day, and he "struggle[d] with sight words, fluency, decoding, and writing." (Tr. 229).

As part of the special education assessment, on December 19, 2007, and January 9, 2008, Karen Mueller, a special education teacher at Plaintiff's elementary school, administered the

---

[2] As of January 17, 2017, the Listings no longer refer to "mental retardation"; the Listings have replaced this with "intellectual disorder." See, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, 2016 WL 5341732, *66148 (Sept. 26, 2016). However, in accordance with the record now before this Court, the Court uses the terminology used by the practitioners in the present case when relating those practitioners' findings and conclusions.

Woodcock-Johnson III Tests of Achievement ("WJR III"), which is "used to identify strengths and weaknesses in the areas of reading, oral language, math, written language and overall academic knowledge." (Tr. 231). Plaintiff scored in the 6th percentile (the "low range") on reading skills and comprehension, he scored in the 19th percentile (the "low average range") on math skills, and he scored in the 17th percentile (the "low average range") on spelling and written expression. (Tr. 231).

Also in January 2008, Licensed School Psychologist Jennie Enz, Ed. S., NSCP, administered the Kaufman Assessment Battery for Children, Second Edition ("KABC II"), a standardized intelligence test. (Tr. 229, 231). The test results indicated that Plaintiff would "have greater difficulty" with short-term memory and recall; he would "struggle significantly when asked to process and problem-solve using visual information"; he had a below-average ability to recall information fluently and efficiently from his long-term memory; and he scored below average on tests which focused on "the breadth and depth of the specific information that has been stored." (Tr. 230-31). Plaintiff scored in the low end of the average range on the tests which measured his ability to anticipate future events, set goals, use strategies to problem-solve, draw inference, understand implications, and apply conceptual reasoning. (Tr. 230). Overall, the KABC-II showed that Plaintiff's intellectual ability was in the Below Average range, and that his full-scale IQ score was 71, which was in the 3rd percentile and also below average. (Tr. 230).

Also as part of the special education assessment, Plaintiff was administered four core subtests of the Clinical Evaluation of Language Fundamentals—Fourth Edition ("CELF-4"), which showed that Plaintiff was in the borderline range of functioning in language skills and performance, oral language expression, and semantic knowledge.[3] (Tr. 233-34). Plaintiff was in

---

[3] Psychologist Enz also interpreted the results of additional tests Plaintiff took during this evaluation, such as the CELF-4 and the Vineland-II. (Tr. 229-41).

the average range of functioning in language comprehension and listening skills, "understanding and production of syntactical structures and morphology," "ability to attach meaning to auditory stimuli and then formulate an expressive response," and ability to integrate language processing skills in order to problem-solve. (Tr. 233-34).

Parent and Teacher Gable completed Vineland Adaptive Behavior Scales, Second Edition (Vineland-II) survey forms for the special education assessment, which showed that Plaintiff's "functioning in his home and community environment was . . .  well-developed and age appropriate, while school related functioning fell in the Adequate to Moderately Low range." (Tr. 235). For example, Plaintiff's daily living skills were rated as Adequate by Parent but Moderately Low by Gable. (Tr. 235). The Vineland-II scores did "not suggest functioning consistent with a Developmental Cognitive Disability." (Tr. 236).

Another test administered to Plaintiff, the Behavior Assessment System for Children, Second Edition ("BASC-2"), showed, among other things, that Teacher Gable rated Plaintiff as having "Clinically Significant Learning Problems and Attention Problems." (Tr. 236-7). Plaintiff's clinical diagnosis of Anxiety Disorder NOS was also noted in the evaluation, (Tr. 236, 238). During a classroom observation on January 15, 2008, Psychologist Enz noted Plaintiff having difficulty staying on-task and completing his assignments; Enz observed that Plaintiff "required significant staff support to complete academic tasks," but he concluded that Plaintiff's hyperactive and impulsive behaviors were not significant. (Tr. 238-39).

Overall, the special education assessment concluded that Plaintiff met the Minnesota standards for the special education category of "Other Health Disability." (Tr. 239, 241). Plaintiff's anxiety disorder was found to adversely affect Plaintiff's ability to complete educational tasks and his difficulties were not better accounted for by another disorder. (Tr. 239).

The evaluation concluded that Plaintiff needed to learn appropriate coping skills, anxiety reduction strategies, and emotional regulation, as well as, increase his ability to follow written and multi-step directions, increase his work-monitoring skills, increase his work completion rate, and increase his on-task behavior. (Tr. 240).

In March 2008, Plaintiff's Individualized Education Program ("IEP") indicated that Plaintiff was receiving special services at federal setting 1, which meant he was out of "regular class" less than 21% of each day. (Tr. 225). Plaintiff had contact with social worker Heather Jacobsen for 20 minutes per day. (Tr. 227). Plaintiff also received 45 minutes of academic support in the school's resource room four times per week. (Tr. 227). The IEP further reflected that Plaintiff was "making nice progress in his reading," and it noted that Plaintiff's school assignments would be modified for length and content, Plaintiff would receive extra time to complete his assignments, non-reading tests would be read aloud to him, and assignments of greater length would be broken down for him. (Tr. 226-27).

On April 30, 2008, Plaintiff saw Dr. Lawrence Condon, M.D., for an initial evaluation due to reports of "easy distractibility, hyper behavior at home and in school, and the inability to sit still or listen." (Tr. 478-79). Dr. Condon noted that Plaintiff's IEP showed a full-scale IQ score of 71 and that a previous psychological assessment "showed that [Plaintiff] is going to have difficulty learning in school from intellectual basis and will need special services." (Tr. 479). Dr. Condon opined: "He is going to have difficulty with his academic performance because of his intellectual limitations." (Tr. 479). Dr. Condon diagnosed Plaintiff with ADHD, oppositional defiant disorder, and mild mental retardation. (Tr. 479-80).

On May 14, 2008, Plaintiff completed a more formal ADHD assessment with Dr. Condon. (Tr. 477). Dr. Condon concluded that Plaintiff had ADHD and recommended

medication, but he noted: "I do not think it is going to make a dramatic difference in [Plaintiff's] learning ability, because his IQ is 71 and he is always going to have some learning disabilities." (Tr. 477-78).

### 3. August 2008 to August 2009 (Third Grade)

The record currently before the Court shows very little from this time period. However, the record does show that Plaintiff received one disciplinary referral at school and that a June 2009 Progress Report indicated Plaintiff was making adequate progress toward his annual reading comprehension and speed goals. (Tr. 224, 345).

### 4. August 2009 to August 2010 (Fourth Grade)

Special Education Teacher Mueller and Social Worker Jacobsen completed a Request for Administrative Information for the Social Security Administration on September 8, 2009, and they reported that Plaintiff's math and written language levels were one and one-half grade levels below his peers. (Tr. 222). They further noted that Plaintiff suffered from anxiety, he received special education in the school's resource room, and he spent 15 minutes per day with a social worker. (Tr. 222).

In a Teacher Questionnaire Special Education completed the same day, Mueller and Jacobsen specifically addressed the six domains of functioning. In Acquiring and Using Information, Mueller and Jacobsen reported that Plaintiff had "an obvious problem" understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, and expressing ideas in written form. (Tr. 244). In Attending and Completing Tasks, Plaintiff had "a serious problem" being able to: refocus to tasks when necessary, carry out multi-step instructions, wait to take his turn, complete assignments, work without distracting

himself or others, and work at a reasonable pace and finish on time. (Tr. 245). Written comments by Mueller and Jacobsen further explained that Plaintiff's "reading is improving, but at a rate that is too slow" and that "academics are very hard for him." (Tr. 244-45). In Caring for Yourself, Plaintiff had no problem taking care of his personal hygiene or his personal needs such as dressing or eating, and Plaintiff had no problem using good judgment regarding personal safety and dangerous circumstances. (Tr. 248). However, there was a serious problem with Plaintiff's abilities to handle frustration appropriately, be patient when necessary, identify and appropriately assert his emotional needs, respond appropriately to changes in his moods, use appropriate coping skills at school, and know when to ask for help. (Tr. 248).

On September 16, 2009, Plaintiff received a disciplinary referral at school for slapping another student in the face in front of witnesses and then lying about it. (Tr. 345). On March 13, 2010, Plaintiff was required to participate in a student conference after he argued with a bus driver who told him to sit down. (Tr. 344-35).

### 5.   August 2010 to August 2011 (Fifth Grade)

In November 2010, the KABC-II was again administered to Plaintiff. (Tr. 262). This time, Plaintiff scored in the 4th percentile with regards to his ability to problem-solve, in the 23rd percentile with regards to his ability to recall information from long-term memory fluently and efficiently, and in the 5th percentile with regards to his ability to anticipate future events, set goals, use strategies, and apply conceptual reasoning. (Tr. 262). However, these test results were reported "with caution as [Plaintiff] tended to give up easily and he reportedly lacked confidence to persist with challenges." (Tr. 262).

On March 22, 2011, the school called Parent after Plaintiff encouraged two other students in his class to engage in a physical fight, saying, "Let them go at it." (Tr. 344). On April 14,

2011, Plaintiff was required to participate in a student conference after he refused to follow directions, walked away from a teacher while the teacher was talking to him, and refused to do his work. (Tr. 343-44).

### 6. August 2011 to August 2012 (Sixth Grade)

On September 20, 2011, Plaintiff received lunch detention after he left class for 5 minutes without permission. (Tr. 343). On September 30, 2011, Plaintiff received detention for being late to class. (Tr. 343). On October 10, 2011, Plaintiff received detention because he obtained permission to go to the water fountain, but then he went to the water fountain and also went to his locker. (Tr. 342).

On October 11, 2011, Plaintiff and his family began in-home family therapy. (Tr. 620). Plaintiff participated in family therapy sessions on December 2, December 16, and December 28, 2011. (Tr. 621, 625). These sessions focused largely on improving family communication and establishing structure within the family. (Tr. 621, 625, 628

Plaintiff began individual therapy sessions at school on November 18, 2011; the treatment notes reflect that Plaintiff was hesitant at first, but he eventually engaged with the service provider. (Tr. 621). The treatment notes from Plaintiff's December 9, 2011, individual therapy session reflect that he "appeared to do well regulating his emotions." (Tr. 623). As part of his individual therapy sessions on December 9, December 19, and December 23, 2011, Plaintiff practiced identifying and verbalizing his feelings. (Tr. 623, 626, 627).

On December 13, 2011, Plaintiff received a time-out at school for failing to follow a teacher's directions. (Tr. 342). On January 12, 2012, Plaintiff received a time-out at school for talking and disrupting class. (Tr. 341-42). On January 18, 2012, Plaintiff received detention;

Plaintiff sat in another student's chair and when the other student tried to stop him, Plaintiff "said that it was gay for the student to touch him." (Tr. 341).

During January and February 2012, Plaintiff attended nine individual therapy sessions. (Tr. 629-31, 633-35, 637, 639-40). At the sessions, Plaintiff practiced identifying and verbalizing his emotions, he practiced identifying and role-playing healthy ways to express anger, practiced speaking respectfully, he engaged in breathing exercises, and he practiced problem solving. (Tr. 629-31, 633-35, 637, 639-40). During this same time frame, Plaintiff participated in family therapy three times. (Tr. 632, 636, 638). The family worked on how to verbalize emotions, communicating more effectively, and modeling appropriate boundaries. (Tr. 632, 636, 638).

In March 2012, Plaintiff had four family therapy sessions and 3 individual therapy sessions. (Tr. 641-48). The individual sessions involved practicing using words, modeling boundaries, identifying feelings, and verbalizing anger and frustration. (Tr. 642, 645-46). The family sessions addressed using respectful words to express emotions and identifying feelings. (Tr. 641, 643-44, 647).

In March 2012, Plaintiff received detention twice for disruptive behavior in the cafeteria during lunch. (Tr. 340-41).

In April 2012, Plaintiff had five individual therapy sessions and four family therapy sessions. (Tr. 648-56). The individual therapy sessions and the family sessions involved practicing identifying feelings and emotions, breathing and relaxation exercises, verbalizing emotions, establishing boundaries, expressing feelings respectfully, and working on communication and listening skills. (Tr. 648-56).

On April 10, 2012, Plaintiff received detention for being disruptive in class. (Tr. 340). On April 26, 2012, Plaintiff received a time-out at school for failure to follow his teacher's directions. (Tr. 339-40).

On May 1, 2012, Plaintiff received detention for "interrupting others while they try to learn. He walked out of class and whistle[d] at students." (Tr. 339). On May 10, 2012, Plaintiff received detention for "[e]xcessive and continuous disruptive behavior which affected the classes [*sic*] learning." (Tr. 338-39).

On May 7, 2012, Plaintiff had his final individual therapy session for the school year, at which he worked on identifying his feelings and verbalizing them appropriately, as well as, modeling healthy boundaries. (Tr. 657). After this session, individual and family therapy services were discontinued, because the "[f]amily was unable to attend scheduled family session at this time." (Tr. 660). The Discharge Summary additionally noted that Plaintiff "was resistant to treatment," and it diagnosed Plaintiff with a mood disorder, identifying his "primary problem" as anger management and his "secondary problem" as "lying/manipulative." (Tr. 659-70).

On June 5, 2012, Plaintiff received a time-out at school for being disruptive. (Tr. 338).

### 7.    August 2012 to August 2013 (Seventh Grade)

Plaintiff's IEP for seventh grade reflected that he was taking a special education math class (also called a "pull-out class") in addition to a general education math class; Plaintiff received an F in his general education math class "due to missing assignments." (Tr. 351). The IEP noted Plaintiff's lack of proficiency in reading, and Parent's concerns about Plaintiff's behavior at school. (Tr. 351). The IEP provided for direct math, reading, and written language instruction for 55 minutes per day, 5 days per week, as well as academic support 55 minutes per

day, 10 times per month. (Tr. 353). Plaintiff was also given extra time to complete assignments, and he was allowed to have tests and quizzes read aloud to him. (Tr. 353).

Plaintiff's first trimester grades were a C+ in choir, an F in computer and engineering class, a "satisfactory" in "Language Arts (reading)," an A in "Language Arts (writing)," a C+ in his pull-out math class, an A- in his general education math class, and an A- in physical education. (Tr. 256). In the second trimester, Plaintiff received a C in art class, an A in "Language Arts (reading)," a B in "Language Arts (writing)," a C+ in pull-out math, a D- in general education math, and a B- in physical education. (Tr. 156). In the third trimester, Plaintiff received a C- in general education math, a B- in family and consumer sciences, an A in physical education, an A in Language Arts (writing), a C in Language Arts (Reading), and an A- in his pull-out Math class. (Tr. 273).

On October 2, 2012, Plaintiff received a disciplinary referral at school after he engaged in "[u]nsafe behavior in the hallway with [his] cousin." (Tr. 338). On October 11, 2012, he received another disciplinary referral for teasing another student. (Tr. 337-38).

On November 5, 2012, Plaintiff received detention for throwing things and talking excessively during class; when his teacher asked him to stop, Plaintiff refused. (Tr. 337). On November 8, 2012, Plaintiff received detention for being excessively tardy to class. (Tr. 337).[4]

On December 3, 2012, Plaintiff received detention after he disrupted class when he "got in front of the class and danced and sang." (Tr. 336). On December 7, 2012, he received detention for being tardy to class. (Tr. 335-36). The afternoon of the same day, Plaintiff was sent to in-school suspension for the remainder of the day after he "[s]napped a rubber band into another student's neck." (Tr. 335).

---

[4] On November 16, 2012, Plaintiff received detention, but this incident was not documented in detail. (Tr. 336).

An IEP Progress Report dated January 11, 2013, stated that Plaintiff was making adequate progress toward his academic goals. (Tr. 264). Plaintiff had "been turning in more homework," and he "want[ed] to retake quizzes in order to get better grades." (Tr. 365).

On January 29, 2013, Plaintiff received detention because, when told he was late for class, he "dropped his binder and kicked it." (Tr. 335).

On March 8, 2013, Plaintiff received detention for being disruptive during class. (Tr. 334).

On April 22, 2013, Plaintiff received detention after he opened a window during class and yelled at a squirrel. (Tr. 334). Four days later, he received detention for pushing and chasing other students during class. (Tr. 333-34).

In June 2013, Plaintiff was reevaluated by Martha Arlandson[5] for his continuing eligibility for special education services. (Tr. 261). Arlandson administered the KABC-II, and this time, Plaintiff scored in the average range in all areas. (Tr. 262). Arlandson noted that Plaintiff's "special education teacher feels current test results are a more accurate estimate of his level of cognitive functioning" than prior testing. (Tr. 263).

Also as part of the reevaluation, special education teacher Laura Thuente administered the WJR III again. (Tr. 263-64). This time, Plaintiff was in the 1st percentile in tests on "Letter-Word identification, Reading Fluency, and Passage Comprehension." (Tr. 264). He was in the 2nd percentile on basic reading skills, and he scored less than the .01st percentile on reading comprehension, which involved vocabulary testing. (Tr. 264). He was in the 9th percentile on the written language testing. (Tr. 265). Plaintiff was in the 14th percentile on broad math testing, in the 17th percentile on math calculation skills, and in the 2nd percentile on math reasoning. (Tr.

---

[5] Ms. Arlandson's credentials are not noted in the record. (Tr. 261).

264). Thuente opined that Plaintiff worked carefully, "worked very hard[,] and was very cooperative" and the test results "seem to be a fair representation of his achievement." (Tr. 265).

Plaintiff's general education math, special education math, family and consumer sciences, and reading teachers also completed surveys as part of the special education reevaluation, and they noted concerns about Plaintiff's ability to acquire information, find key facts or ideas when studying, complete tasks, be organized, edit work, put information together, plan appropriately, follow two-and-three-step directions, remember materials heard, and follow visually presented directions, among other concerns. (Tr. 265).

In conjunction with the reevaluation, Parent completed a BASC-2, three of Plaintiff's teachers completed BASC-2 Teacher Rating Scales, and Plaintiff completed the BASC-2 Self-Report. (Tr. 268-70). In summary, the reports indicated:

> at-risk to clinically significant level[s] of concern in the areas of hyperactivity, aggression, conduct problems, attention problems, atypicality, depression, and learning problems. Deficits were indicated in adaptability, study skills and social skills. [Plaintiff] endorsed items indicating that he tends to take risks and seek excitement. [Parent] indicated significant levels of hyperactivity, anxiety and depression as well as at-risk levels of conduct problems, atypicality, withdrawal, and attention problems. Deficits were noted in adaptability, leadership, activities of daily living, and functional communication.

(Tr. 270).

In an interview, Plaintiff indicated that he typically completed his homework, but he needed help from family members to do so. (Tr. 270). His least favorite class was reading because he found it "kind of hard" and "does not like staying still." (Tr. 270). During another interview, Parent stated that she had continuing concerns, but she remained hopeful about Plaintiff's emotional lability. (Tr. 270). The reevaluation noted Plaintiff's disciplinary record; that Plaintiff had been diagnosed with ADHD, anxiety, and depression; and that Parent had discontinued Plaintiff's medication because Plaintiff had lost his appetite and become fatigued.

(Tr. 266, 270). The functional behavior assessment portion of the reevaluation noted that Plaintiff tended to "shut down and refuse to respond or participate in class" and he "gives up quickly and is self-defeating when tasks become challenging" or he lacked confidence in his ability to complete a task. (Tr. 271). Plaintiff also shut down when he experienced anxiety, anger, depression, or frustration. (Tr. 271-73). When interacting with certain peers, Plaintiff became disruptive and had difficulty restraining his behavior. (Tr. 271).

The evaluation concluded that Plaintiff continued to need direct and specialized instruction in reading and writing and general education, as well as, direct special education services with respect to organization, work completion, and behavior management. (Tr. 273). Plaintiff's "cognitive level has been measured to fall within the average range when compared to his same-age peers," but his "emotions and behaviors can impact his functioning and performance on academic tasks when he is highly frustrated or agitated." (Tr. 274). Academic testing indicated that Plaintiff could "perform within the very low range in basic reading, reading comprehension and math reasoning. He scored within the low average range in math calculation and written expression." (Tr. 274). The "main concerns" at the time were Plaintiff's "work refusal and lack of communication when frustrated or upset." (Tr. 274). The reevaluation further indicated that Plaintiff's "[u]nsatisfactory educational progress [was] not primarily a result of intellectual sensory, physical, health, cultural or linguistic factors, illegal chemical use, autism spectrum disorders, or inconsistent educational programming." (Tr. 275).

### 8.  August 2013 to August 2014 (Eighth Grade)

Plaintiff's IEP for the eighth grade noted that he was reading and comprehending at a third-grade independent level and a fourth-grade instructional level. (Tr. 255). Plaintiff continued in a pull-out math class and went to a "resource class" every other day to complete his

22

homework or retake tests and quizzes if needed. (Tr. 255). The IEP also noted that in the future Plaintiff would be pulled from two general education classes in order to attend two special education language arts classes. (Tr. 257). Additionally, Plaintiff would continue in the resource class every other day. (Tr. 257). The IEP provided for 50 minutes of academic support 10 times per month, 100 minutes of direct written language and reading instruction every school day, and 20 minutes of social work services once per week. (Tr. 257).

During the first trimester of eighth grade, Plaintiff had received a C in Global Studies, a "pass" in Health, an A- in pull-out Reading, an A in Language Arts, a D+ in Math, an A in Physical Education, and a C+ in Science. (Tr. 385). During the second trimester, Plaintiff received an F in Global Studies, a C in Health, an A- in pull-out Reading, a B in Language Arts, a D- in Math, a "pass" in Physical Education, and a C- in Science. (Tr. 385).

On September 25, 2013, Plaintiff was required to participate in an administrative conference after he repeatedly ignored a teacher. (Tr. 333). On September 30, 2013, Plaintiff received detention for roughhousing and being disruptive during lunch despite being warned three times to stop. (Tr. 332-33).

On October 7, 2013, Plaintiff had an administrative conference after he failed to complete required work. (Tr. 332).

On December 11, 2013, Plaintiff received detention for being disrespectful to multiple adults at school. (Tr. 332.) On December 17, 2013, Plaintiff received detention for refusing to cooperate, walking out of class, and "playfully hit[ting] another student." (Tr. 331-32).

On January 14, 2014, Plaintiff was disciplined at school (the sanction was not identified in the record) for continuing to talk after being repeatedly told to stop. (Tr. 330-31). The same

day, he was asked to write a letter of apology to a teacher for "[l]aughing at another student's behavior referral." (Tr. 331).

On February 19, 2014, Plaintiff received detention at school for being disrespectful to a teacher. (Tr. 330).

On March 6, 2014, Plaintiff was suspended from school for being "repeatedly off task, and [] disruptive to other students." (Tr. 329-30).

On March 25, 2014, Special Education Teacher Thuente completed a Request for Administrative Information for the Social Security Administration. (Tr. 500-09). Thuente, who interacted with Plaintiff daily at school, indicated that although Plaintiff was in the eighth grade and was at an eighth-grade proficiency level in math, he read and wrote at a third-to-fourth grade level. (Tr. 502). Again, the Request for Administrative Information specifically addressed the six domains of functioning. In Acquiring and Using Information, Thuente noted Plaintiff had a slight problem comprehending oral instructions and comprehending and doing math problems. (Tr. 503). Plaintiff had an obvious problem understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, and learning new material. (Tr. 503). He had a serious problem reading and comprehending written material, as well as, applying problem-solving skills in class discussions, and he had a very serious problem recalling and applying previously learned material. (Tr. 503). Plaintiff needed constant monitoring and frequent redirection in order to stay on task, which sometimes made him very upset. (Tr. 503-04). In Caring for Yourself, Thuente reported that Plaintiff had no problem taking care of his personal hygiene; caring for his physical needs; or cooperating in, or being responsible for, taking needed medications. (Tr. 507). Plaintiff had a slight problem with using good judgement

24

regarding personal safety and dangerous circumstances, and he had a serious problem handling his frustration appropriately, being patient when necessary, identifying and appropriately asserting his emotional needs, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. (Tr. 507). Plaintiff had a very serious problem responding appropriately to changes in his own mood and calming himself. (Tr. 507).

On April 14, 2014, state agency medical consultant Margaret Getman, PhD, LP, completed a Medical Evaluation Document, in which she noted that Plaintiff suffered from the impairment of a "Learning Disability," but she concluded that more than minimal medical improvement had occurred. (Tr. 510-13). Dr. Getman specifically noted "[s]ignificant improvement in cognitive functioning" based upon an improvement in Plaintiff's scores on cognitive testing. (Tr. 512). Dr. Getman opined that Plaintiff's impairments caused less than marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself, and she opined that his impairments caused no limitations in Moving About and Manipulating Objects or Health and Well-Being. (Tr. 515-16). Dr. Getman ultimately concluded that Plaintiff's impairment or combination of impairments, while severe, did not functionally equal the Listings. (Tr. 517, 519).

On April 14, 2014, Plaintiff received detention for going to his locker without permission. (Tr. 329).

On April 26, 2014, Kiley C. Krocak, LICSW, came to Plaintiff's home and conducted a standard diagnostic assessment based on Parent reporting concerns about Plaintiff's moods and anxiety, which Parent stated were leading to academic struggles and conflicts at home. (Tr. 523, 528). In relevant part, Social Worker Krocak noted that Plaintiff had previous diagnoses of

ADHD, Anxiety Disorder, and Learning Disability, and she opined that Plaintiff "continues to meet criteria for Learning Disorder, NOS based on school reports." (Tr. 524, 528).

On May 2, 2014, Plaintiff received detention for being "verbally disruptive and throwing cord around" a classroom. (Tr. 329).

Plaintiff's IEP team had a meeting on May 15, 2014, at which Parent was present. (Tr. 385, 390). Plaintiff's proficiency tests in math and reading continued to result in scores that did not meet proficiency, but the IEP team noted that Plaintiff also continued to have difficulty with being impulsive and disruptive in class and when Plaintiff was willing, he was "able to work very hard in classes." (Tr. 386). Parent reported that "[a]t home she sees him as able to work hard and complete work, and wants that work to be transferred to his school work." (Tr. 386). The IEP team concluded that Plaintiff would continue to receive academic support for 53 minutes, 10 times per month; direct reading instruction for 53 minutes, 5 times per week; social work services for 25 minutes, 1 time per week; and social skills instruction for 55 minutes, 5 times per week. (Tr. 387).

In a letter dated May 21, 2014, Special Education Teacher Thuente and school Social Worker Laura Kvamme opined that Plaintiff "relies on his negative behavior to get him out of doing difficult work." (Tr. 521).

On May 27, 2014, Plaintiff saw Dr. Jennifer MH McCormack, MD, for treatment of his ADHD. (Tr. 522, 551). Dr. McCormack started Plaintiff on Adderall XR. (Tr. 552).

On June 11, 2014, state agency medical consultant Dr. R. Owen Nelsen, Ph.D, L.P., completed a Childhood Disability Evaluation Form. (Tr. 554-55). Dr. Nelsen found more than minimal improvement in Plaintiff's impairments, which he identified as being ADHD and a learning disability. (Tr. 554). Dr. Nelsen concluded that Plaintiff's impairments caused less than

marked limitations in Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating With Others, and Caring for Yourself, and Plaintiff's impairments caused no limitations in Moving About and Manipulating Objects and Health and Physical Well-Being. (Tr. 556-57). Dr. Nelsen further opined that it was "[d]oubtful that child meets a capsule definition of [mental retardation]," pointing to the variability in cognitive testing scores, the "[s]ignificant improvement in cognitive functi[o]ning since" prior test scores, and Dr. Nelsen's opinion that some of the test scores were much higher than would be anticipated based upon the IQ scores Plaintiff received. (Tr. 559). Dr. Nelsen also noted that although Plaintiff's academic skills were delayed, they were "already above levels needed for adult independent living and competitive employment." (Tr. 560). Therefore, although Plaintiff's impairments remained severe, Dr. Nelsen concluded that his limitations did not meet or equal any Listing. (Tr. 560).

### 9.  August 2014 to the ALJ's Hearing Decision on December 8, 2014 (Ninth Grade)

On August 13, 2014, Plaintiff restarted in-home family therapy with Chong (Maylee) Chang, MA, LPC. (Tr. 662). The sessions focused on skills that would help Plaintiff at school, such as coping skills, thought and feeling expression, scheduling, and frustration tolerance. (Tr. 668). Plaintiff participated in family therapy five times in August 2014. (Tr. 662, 664-66, 671). Counselor Chang observed that Plaintiff "has difficulties following directions and becomes easy [*sic*] frustrated when asked to perform simple tasks." (Tr. 667). Counselor Chang further noted that Plaintiff had low frustration tolerance, difficulty communicating effectively, and difficulty with academics, among other things. (Tr. 667).

In September 2014, Plaintiff had six in-home family therapy sessions. (Tr. 673-80). Plaintiff continued working on his ability to express his feelings and listen, his homework and

time management skills, (Tr. 673, 675, 680). At times, however, Plaintiff was uncooperative, he lacked focus, and he refused to engage. (Tr. 674, 676-77).

In October 2014, Plaintiff had five in-home family therapy sessions and an additional four individual therapy sessions at school. (Tr. 681-90). During the family therapy sessions, Plaintiff worked on coping with his anxiety, paying attention, effective communication, and the family worked on improving communication between family members. (Tr. 681, 683-85, 688). In his first individual sessions, Plaintiff was resistant and overreacted about missing class to see Counselor Chang. (Tr. 682, 686). In later individual sessions, however, Plaintiff was more cooperative and willing to practice different ways of interacting, although at times he was still disruptive and disrespectful. (Tr. 689-90).

In a letter dated November 6, 2014, Joshua Mattson, Plaintiff's high school Special Education Case Manager, who had met with Plaintiff briefly two to three times per week, reported that Plaintiff had struggled with the transition to high school. (Tr. 423). His IEP had been "modified to provide additional services, including: reduced science assignments, having science tests read to him, having access to the teacher's notes, and having access to . . . a resource room where he can get paraprofessional support for academics." (Tr. 423; see, also, Tr. 443-44). Plaintiff was being removed from general education math class and placed into special education math class. (Tr. 423). Mattson opined that Plaintiff was "extremely immature and can be quite off-task when around his friends." (Tr. 423). Plaintiff had been written up twice for disciplinary incidents in the ninth grade as of the date of Mattson's letter: on September 30, 2014, for leaving class without permission, and on October 9, 2014, "when he grabbed a female student by the arm and refused to release [her] when asked to do so." (Tr. 423).

C.     **Hearing Testimony and Statements**

**1.  July 17, 2014 Hearing before Disability Hearing Officer Keplar**

On July 17, 2014, the Disability Hearing Officer held a hearing as part of the request for reconsideration. (Tr. 101, 113). Parent testified that she usually drove Plaintiff to school because he would miss the school bus. (Tr. 115). Parent further testified Plaintiff had trouble with math and reading, he had poor coping skills, and he took only special education classes at school. (Tr. 114). She also testified that Plaintiff had been suspended from school several times for fighting, Plaintiff was currently involved with law enforcement because of stealing, and police had been called to their home by neighbors due to fights between Plaintiff and his sister. (Tr. 114). According to Parent, Plaintiff would not listen to her or obey her requests and at times would be so angry he would leave the home and not return for hours. (Tr. 114-15). When at home, Plaintiff spent most of his time alone in his room, and he did not shower or brush his teeth without repeated reminders. (Tr. 115). Parent had tried to teach Plaintiff to cook, "but he almost burnt down the kitchen." (Tr. 115). Furthermore, Plaintiff had never held a job other than mowing a neighbor's lawn (which ended when some items were stolen from the neighbor) and that Plaintiff could not handle money; "he would just lose it." (Tr. 115).

Plaintiff also testified at the hearing. (Tr. 115). He stated that he was in special education classes and mainstream classes, and he identified a book he had read in school, he described some of the school work he had done, and he described the content of a magazine article he had read recently. (Tr. 115). Plaintiff was only interested in basketball, which he played with his friends about 3 times per week. (Tr. 115). Plaintiff testified that he had over 100 friends and he had a best friend who never came to Plaintiff's house, but Plaintiff went to his friend's house 3 times per week. (Tr. 115). Plaintiff stated that he had been sent to the office at school at least

twice per week the previous year for talking to friends and not listening. (Tr. 115). Plaintiff further testified that he spent approximately an hour a day in his room playing video games, and the rest of the time he slept. (Tr. 115). During the summer, he liked to walk around and hang out with friends, but he did not like to ride public buses because he felt like people stared at him, which caused him to get into fights. (Tr. 115-16).

### 2.  November 14, 2014, Hearing before ALJ Kunz

On November 14, 2014, the ALJ held an administrative hearing. (Tr. 33). At the time of the hearing, Plaintiff was in ninth grade. (Tr. 38). At the hearing, Plaintiff testified that reading and math were hard for him. (Tr. 38-39). He was in a smaller class for science, as well as, a resource class, in which he did his homework. (Tr. 39). Plaintiff played on the school basketball team, and although he acknowledged that he had gotten into trouble at school, he stated he could not remember what had happened. (Tr. 40-42). Plaintiff could prepare food for himself, but only using the microwave. (Tr. 41). He stated that he was on medication, but he did not know what the medication was called or what it was for. (Tr. 41-42). Plaintiff testified that he got along with his brother and mostly got along with his sister, although sometimes he and his sister fought both verbally and physically. (Tr. 43). Plaintiff stated that he had one friend he spent time with outside of school; they played basketball and watched television. (Tr. 43). Plaintiff admitted that when he became frustrated or angry, he slammed doors, yelled, and stopped talking to everyone; he further admitted that at least once he had thrown things out of anger or frustration. (Tr. 44).

Parent also testified at the administrative hearing; she stated that she had to perform many of the same tasks for Plaintiff that she did for her 7-year-old child, including getting him ready for school, getting his toothbrush, and getting him ready to take showers. (Tr. 45-46). Parent said that if she did not remind Plaintiff to do these things, he would not do them. (Tr. 46). She

testified that Plaintiff's room was "[v]ery filthy and nasty" despite her attempts to get Plaintiff to clean it. (Tr. 51-52). She stated that Plaintiff was physically aggressive with his sister, to the extent that the police had been involved twice, but Plaintiff was not physically aggressive with anyone else. (Tr. 53).

Parent further testified that Plaintiff read at a third- or fourth-grade level, and he had a tough transition to high school because he couldn't keep up. (Tr. 46, 48-49). Plaintiff also had trouble keeping track of his school books and papers; Parent gave the example that Plaintiff had once put his book in the garage and forgotten about it for 2 weeks. (Tr. 49-50). She testified that Plaintiff's current medication was not helping him at all. (Tr. 46-48). When Plaintiff became angry—which had occurred more frequently in the past year—or frustrated, he bit his nails, yelled, or slammed doors. (Tr. 56). Parent further testified that Plaintiff "absolutely" could not remember to take his medication on his own and that he only took it "sometimes" on non-school days or on weekends. (Tr. 52-53).

Next, Dr. Karen Butler, PhD., a state agency medical expert, testified. (Tr. 59, 187). Dr. Butler testified that as of May 2014, there had been medical improvement in the two domains of functioning in which Plaintiff had suffered marked limitations in May 2009: (1) acquiring and using information and (2) attending and completing tasks. (Tr. 62-63; see, also, 486). Dr. Butler further testified that as of May 1, 2014, Plaintiff had the medically determinable impairments of anxiety and ADHD, which Dr. Butler opined were severe but did not meet or medically equal any Listings. (Tr. 63-64). When the ALJ asked whether Plaintiff's impairments functionally equaled any of the Listings—in the context of the domains of functioning—as of May 1, 2014, Dr. Butler highlighted certain medical evidence of record and concluded that Plaintiff's ability to

attend and complete tasks was markedly impaired, but his limitations in other domains were less than marked. (Tr. 64-67).

Dr. Butler clarified that her opinions were based on evidence submitted up to the present, and they were not based only on the evidence that predated May 1, 2014. (Tr. 67-68). On cross-examination, Dr. Butler agreed that some of the test scores did not suggest improvement of Plaintiff's impairments. (Tr. 71-72). Dr. Butler also agreed that each time Plaintiff's IEP was reviewed, additional services were implemented to support his learning. (Tr. 72). Upon further questioning, Dr. Butler conceded that Plaintiff's reading had not improved, but his IQ score had risen. (Tr. 80). Dr. Butler also testified that aside from the improvement in IQ score, the record contained other indications of an increase in functional abilities, such as improvement in Plaintiff's disciplinary or behavioral record at school. (Tr. 73-74).

### D.    The ALJ's Decision

The ALJ determined that Plaintiff's disability ended as of May 1, 2014, and Plaintiff had not become disabled again since that date. (Tr. 28).

In reaching her decision, the ALJ followed the required three-step sequential analysis for conducting a periodic review of a child's eligibility for disability benefit. (Tr. 12-14); 20 C.F.R. § 416.994a(b). The ALJ found that at the time of the CPD (December 4, 2009), Plaintiff had the medically determinable impairments of borderline intellectual functioning and ADHD, which caused marked limitations in (1) Acquiring and Using Information and (2) Interacting and Relating with Others. (Tr. 15-16).

In the first step of the analysis, the ALJ concluded that the medical evidence of record supported a finding that as of May 1, 2014, the medical severity of Plaintiff's impairments had decreased since the CPD. (Tr. 16). Because Plaintiff now concedes that the ALJ correctly found

that medical improvement occurred, the Court does not elaborate further on the ALJ's finding on this step. (See, Plf. Mem., [Docket No. 14], 15). At the second step of the analysis, the ALJ concluded that the impairments Plaintiff had at the time of the CPD did not, as of May 1, 2014, functionally equal the Listing of Impairments. (Tr. 16, 24). Plaintiff again concedes that this determination by the ALJ was correct. (Plf. Mem., [Docket No. 14], 16).

Under step three of the analysis, the ALJ then considered Plaintiff's current severe impairments, which the ALJ found were Anxiety, NOS and ADHD. (Tr. 24). The ALJ based the classification of these impairments as severe on Dr. Butler's testimony. (Tr. 25). The ALJ concluded that since May 1, 2014, Plaintiff's current impairments or combination of impairments had not met or medically equaled a Listed impairment identified in 20 C.F.R. Part 404, Subpart P, Appendix 1; the ALJ also based this conclusion on Dr. Butler's testimony that Plaintiff's impairments did not meet or equal a Listing. (Tr. 25).

Regarding whether Plaintiff's impairment or combination of impairments since May 1, 2014, functionally equaled a Listed impairment, the ALJ specifically noted Plaintiff's and Parent's testimony at the administrative hearing. (Tr. 25-26). The ALJ concluded that their testimony and statements of record did not support a finding of greater limitations than those found by Dr. Butler, because the weight of the record did not support the degree of severity asserted by Plaintiff and Parent. (Tr. 26).

The ALJ also noted Dr. Butler's testimony at the administrative hearing that Plaintiff's impairments no longer functionally equaled a Listing. (Tr. 26). The ALJ found that Dr. Butler's opinion was supported by the evidence of record, including objective testing and school records, and was given great weight due to Dr. Butler's ability to review all of the evidence and her expertise in evaluating childhood disability under the applicable regulations. (Tr. 26). The ALJ

also gave great weight to state agency consultants Dr. Getman and Dr. Nelsen's opinions, as they too reviewed the evidence and their conclusions that Plaintiff's impairments were severe but did not meet, equal, or functionally equal a Listing were consistent with the objective findings, school records, and treatment records before the ALJ. (Tr. 26). Additionally, the ALJ gave great weight to a teacher questionnaire, finding it was supported by the objective evidence of record, including treatment notes and other school records. (Tr. 26).

Ultimately, the ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, the administrative hearing statements concerning the intensity, persistence, and limiting effects of those symptoms since May 1, 2014, were not credible to the extent that they alleged that Plaintiff's impairment or combination of impairments functionally equaled a Listing. (Tr. 26). The ALJ explained further her findings regarding the limitations in each of the six domains of functioning since May 1, 2014, concluding that Plaintiff's impairments caused no limitations in Moving About and Manipulating Objects nor in Health and Physical Well-Being; less than marked limitations in Acquiring and Using Information, Interacting and Relating with others, and Caring for Yourself; and marked limitations in only Attending and Completing tasks.[6] (Tr. 26-28). Accordingly, because Plaintiff's impairments since May 1, 2014, either did not result in marked limitations in two domains of functioning or extreme limitation in one domain of functioning, the ALJ concluded that Plaintiff had not become disabled again since May 1, 2014. (Tr. 28).

## V.    STANDARDS OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits. There are several benefits programs under the Act, including the DIB

---

[6] To the extent that Parent now challenges these conclusions, the ALJ's reasoning and analysis in reaching the conclusions is set forth supra, in the analysis section. See, Part VI.B, supra.

Program of Title II (42 U.S.C. §§ 401, <u>et seq</u>.) and the SSI Program of Title XVI (42 U.S.C. §§ 1381, <u>et seq</u>.). An individual under age 18 is "disabled" if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. In addition, any individual under age 18 who engages in substantial gainful activity is not considered disabled. <u>Id.</u> After a child is found to be disabled, the Commissioner may conduct "continuing disability reviews" to evaluate the child's impairments periodically and determine whether the child is still eligible for disability benefits. 20 C.F.R. § 416.989; <u>see</u>, <u>also</u>, 20 C.F.R. 416.990(d).

The standard of review for a termination of social security benefits awarded to a child is the same as judicial review of the Commissioner's decision to deny disability benefits; it is constrained to a determination of whether the decision is supported by substantial evidence in the record as a whole. <u>See</u>, <u>Brown v. Colvin</u>, No. 14CV1717 ACL, 2016 WL 795803, * (E.D. Mo. March 1, 2016) (applying standards of review to cessation of a child's disability benefits case); <u>see</u>, <u>also</u>, <u>Tellez v. Barnhart</u>, 403 F.3d 953, 956 (8th Cir. 2005) (setting forth standard of review). Substantial evidence means more than a scintilla, but less than a preponderance. <u>Slusser v. Astrue</u>, 557 F.3d 923, 925 (8th Cir. 2009). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting <u>Gavin v. Heckler</u>, 811 F.2d 1195 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." <u>Id.</u> (quoting <u>Universal Camera Corp. v. Nat'l Labor Relations Bd.</u>, 340 U.S. 474, 488 (1951)).

When reviewing the record for substantial evidence, the court may not reverse the Commissioner's decision simply because substantial evidence exists to support the opposite conclusion. Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). Moreover, the Court may not substitute its own judgment or findings of fact for those of the ALJ. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989). After balancing the evidence, if it is possible to reach two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ "is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." Id.

## VI.    ANALYSIS

The parties have filed cross-Motions for Summary Judgment. ([Docket Nos. 13, 15]). Plaintiff does not challenge the ALJ's findings and conclusions at the first two steps of the analysis. (Plf. Mem., [Docket No. 14], 15-16). He challenges only the ALJ's findings and conclusions in the third step of the analysis. First, Plaintiff contends that the ALJ erred by failing to include learning disability as a medically determinable severe impairment since May 1, 2014. (Id. at 17-25). Second, Plaintiff asserts that the ALJ erred in her determination of Plaintiff's limitations since May 1, 2014, in Acquiring and Using Information, Interacting and Relating with Others, and Caring for Yourself. (Id. at 17, 30-32).

In response, Defendant contends that she is entitled to summary judgment because each of Plaintiff's arguments are unavailing, and because the ALJ's decision is supported by substantial evidence in the record. (Def's Mem., [Docket No. 16], 10-16).

### A.    Identification of Plaintiff's Current Severe Impairments

Plaintiff first argues that the ALJ erred by failing to identify "Learning Disability" as one of Plaintiff's current severe impairments.[7] (Plf. Mem., [Docket No. 14], 17-25).

Initially, the Court notes that it is unclear precisely what Plaintiff means by "Learning Disability." The category for "Learning Disorders" in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (DSM-IV-TR)[8] contains four learning disorders: Reading Disorder, Mathematics Disorder, Disorder of Written Expression, and Learning Disorder Not Otherwise Specified. DSM-IV-TR (2000), 49-56. Plaintiff does not specifically identify which of the four learning disability categories he is asserting as a severe impairment. (See, Plf. Mem., [Docket No. 14], 18-20). Moreover, the references to Plaintiff's "learning disability" in the record now before the Court are at best inconsistent. (See, e.g., Tr. 65 (Dr. Butler testifies that Plaintiff had been "diagnosed with a learning disability, NOS"), 121-23 (Hearing Officer finds Plaintiff's "learning disabilities" constitute a severe impairment without further identifying those disabilities), 528 (Social Worker Krocak's diagnostic impression of

---

[7] Plaintiff makes this argument in the context of the ALJ's decision that Plaintiff suffered only less than a marked limitation in the domain of Acquiring and Using Information. (See, Plf. Mem., [Docket No. 14], 16-27). Specifically, Plaintiff contends that proper consideration of his learning disability necessarily results in a finding that he had marked limitation in the domain of Acquiring and Using Information. (Id. at No. 14], 17). However, current limitations in domains are determined in the third part of step three of the analytical process, see, 20 C.F.R. § 416.926a(b)(3). Determining whether a child currently has a severe impairment or combination of impairments occurs during the first part of step three of the analytical process. Id. Although these issues are interrelated, they are distinct steps of the sequential review process and must be treated as such. See, Garcia v. Comm. of Social Security, 105 F. Supp. 3d 805, 811 (S.D. Ohio 2015) (finding error where ALJ in social security proceedings "conflate[d] the distinct steps of the sequential review process").

[8] Plaintiff acknowledges that the DSM-IV had been supplanted by the DSM-V by the time of the hearing before the ALJ in this case, yet Plaintiff cites to the DSM-IV because the diagnosis of "Learning Disorder Not Otherwise Specified," which appears in the administrative record now before the Court no longer exists in the DSM-V and the medical expert testified at the hearing before the ALJ in this case regarding the diagnosis under the DSM-IV. (Mem. in Supp., [Docket No. 14], 18 n.10).

"learning disability" using the diagnostic code for Disorder of Written Expression), 566 (Dr. McCormack identifies a "coexisting condition" as "learning disability" without further identification)).

However, identifying the precise learning disorder on which Plaintiff bases his argument is not crucial to the analysis in the present case. Plaintiff cites multiple points in the record now before this Court to support his contention that his learning disability was a medically determinable impairment. (Plf. Mem., [Docket No. 14], 19-25). However, even if an impairment is medically determinable, it is not "severe" if it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." See, 20 C.F.R. § 416.924(c).

Plaintiff cites to Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001), to support his assertion that the burden on him to show that his learning disability was a severe impairment was "not great." (Plf. Mem., [Docket No. 14], 24). Caviness is inapplicable here, because it addressed a denial of an initial application for adult disability benefits, which uses an entirely different analysis than the analysis applicable in the case now under review before the Court. See, 250 F.3d at 603-05. The language Plaintiff quotes, when read in context, states that the burden on a claimant to show "a severe impairment that significantly limited her physical or mental ability to perform basic work activities . . . is not great." Id. at 605. In the present child benefits analysis, an impairment is considered severe unless it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." See, 20 C.F.R. § 416.924(c).

Although the record now before this Court shows that Plaintiff had an ongoing diagnosis of some variable degree of learning disability, this is not enough by itself for this Court to find

that the ALJ erred in her determination that Plaintiff's learning disability after May 1, 2014, was not a "severe impairment." Plaintiff emphasizes the evidence in the record which showed Plaintiff had clinically significant behavioral problems. (Plf. Mem., [Docket No. 14], 20-24). For example, Plaintiff points out that the BASC-2 in early 2008 reported that Plaintiff had clinically significant problems with behavioral functioning and that Plaintiff's classroom teachers indicated Plaintiff had "Clinically Significant Learning Problems." (Tr. 237). However, this BASC-2 does not further explain what is meant by "Clinically Significant Learning Problems" or otherwise indicate that Plaintiff's learning disability—rather than, for example, his behavioral problems or his ADHD—was causing his learning problems. (Tr. 237). The June 2013 evaluation, which is much closer in time to the ALJ's decision, did not contain a similar indication of learning disability, and it noted that Plaintiff's "cognitive level has been measured to fall within the average range when compared to his same-age peers," and his "emotions and behaviors can impact his functioning and performance on academic tasks when he is highly frustrated or agitated." (Tr. 274). In addition, in June 2014, state agency medical consultant Dr. Nelsen noted that although Plaintiff's academic skills were delayed, they were "already above levels needed for adult independent living and competitive employment." (Tr. 560).

Simply put, while there is evidence in the administrative record now before this Court which shows variable diagnosis of learning disability, there is little evidence which specifically identifies Plaintiff's learning disability, and there is even less evidence which directly connects a learning disability to Plaintiff's functional limitations after May 1, 2014.[9] While the record

---

[9] Plaintiff notes in a footnote in his Memorandum in Support that there is a new Listing (Listing 12.11), effective January 17, 2017, which defines "neurodevelopmental disorders," which includes "specific learning disorder" and arguably may be shown by the evidence in the record currently before this Court. (Mem. in Supp., [Docket No. 14], 19 n.12). Plaintiff does not request remand for consideration of this Listing and at the time the present case was before the ALJ for consideration and decision, this Listing was not in effect. See, 81 Fed. Reg. 66138-01, 2016 WL 5341732, *66138 (Sept. 26, 2016) ("[T]hese final rules will be effective on January 17, 2017. . . . When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules and to

before the Court does demonstrate evidence that Plaintiff struggled with his schoolwork and experienced behavioral problems at school, it is possible to infer from the record now before this Court that Plaintiff's learning disability was possibly the root of his behavioral problems or his academic troubles, but it is also equally reasonable on the present record to decline to do so as the ALJ did.

There is substantial evidence in the record as a whole to support the ALJ's decision that Plaintiff's learning disability was not a severe impairment on or after May 1, 2014, which was the time of the cessation of Plaintiff's child benefits. Therefore, the ALJ's determination that Plaintiff's learning disability was not a severe impairment on or after May 1, 2014, was "within the 'available zone of choice,'" and this Court cannot recommend reversal based upon that choice. See, Bradley, 528 F.3d at 1115; Robinson, 956 F.2d at 838.

In any event, even assuming solely for the sake of argument that the ALJ erred by not specifically identifying Plaintiff's learning disability as a severe impairment, such error is harmless. As the ALJ noted in her Hearing Decision, assessing whether a child claimant who is appealing a cessation of benefits decision has an impairment or combination of impairments that functionally equals a Listing requires an ALJ to "assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments you have that are not 'severe.'" (Emphasis added.) (Tr. 14). See, also, 20 C.F.R. § 416.926a(a). The ALJ did not exclude from consideration any effects of Plaintiff's learning disability simply because she found that the learning disability was not severe. Rather, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted with the objective medical evidence and other evidence. . . . The [ALJ] has also considered opinion evidence." (Tr. 25).

claims that are pending on or after the effective date."). Therefore, this Court does not further address new Listing 112.11.

Plaintiff argues that it is clear that the ALJ did not consider evidence of his learning disability because the phrase "learning disability" is not written anywhere in the ALJ's Decision; because the ALJ did not acknowledge certain specific information such as the results of the WJ-III, which Plaintiff was administered in 2013 and which showed Plaintiff scored well below average; and because the ALJ did not acknowledge Plaintiff's return to special education math class. (Plf. Mem., [Docket No. 14], 26-27; Tr. 263-65). However, it is well-established that "[a]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

Therefore, even assuming solely for the sake of argument that it was error for the ALJ to determine that Plaintiff's learning disability was not a severe impairment at step two of the analysis, any such error was harmless because the ALJ considered any limitations caused by Plaintiff's learning disability when next determining whether Plaintiff's impairments functionally equaled a Listing.

### B.    Functional Equivalence to the Listings

When determining if a child is currently disabled under 20 C.F.R. §§ 416.924 (c) and (d), if the child has a severe impairment or combination of impairments which do not meet or medically equal a Listing, the ALJ must decide whether the child's impairment or combination of impairments functionally equals a Listing. 20 C.F.R. § 416.994a(b)(3). To "functionally equal the listings," the severe impairment or combination of impairments "must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

In this case, Plaintiff contends that the ALJ erred in her analysis at step three by finding that Plaintiff had less than marked limitations in the domains of (1) Acquiring and Using Information, (2) Interacting and Relating with Others, and (3) Caring for Yourself. (Plf. Mem., [Docket No. 14], 16, 29). Plaintiff asserts that the record as a whole supports a finding that Plaintiff suffered marked limitations in these domains. (Id.). A limitation is considered "marked" when the impairment or combination of impairments "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities.'" 20 C.F.R. § 416.926a(e)(2)(i).

### 1. Acquiring and Using Information

The domain of Acquiring and Using Information addresses how well a child acquires and learns information, and how well he or she uses that information. 20 C.F.R. § 416.926a(g). Specifically, adolescents, the age group in which Plaintiff fell at the relevant times, should be able to demonstrate what they have learned in academic assignments; use lessons of daily living to, for example, go to the store or use public transportation; be able to comprehend and express simple and complex ideas; and be able to apply skills in practical ways. See, 20 C.F.R. § 416.926a(g)(2)(v). Examples of limited functioning in this domain include a failure to demonstrate an understanding of words about space, time, or size; inability to rhyme; difficulty remembering things learned in school the prior day; difficulty with mathematics; and talking only in short, simple sentences. 20 C.F.R. § 416.926a(g)(3).

Plaintiff argues that the ALJ's failure to recognize his learning disability as a "severe impairment" caused the ALJ to err in her determination that Plaintiff's impairments caused a less than marked limitations in this domain. (Plf. Mem., [Docket No. 14], 17, 24, 26-27). As already set forth above, however, an ALJ's failure to explicitly acknowledge certain evidence is not an indication that such evidence was not considered, and the ALJ's failure to identify Plaintiff's

learning disability as "severe" does not indicate that the ALJ completely disregarded Plaintiff's difficulties in the domain of Acquiring and Using Information. See, part V.A, supra.

Moreover, this Court's review of the record as a whole shows that substantial evidence supported the ALJ's determination that Plaintiff's impairments caused a less than marked limitation in Acquiring and Using Information. State agency medical consultants Dr. Getman and Dr. Nelsen, who reviewed Plaintiff's records in April 2014 and June 2014, came to the same conclusion. (Tr. 515, 556). At the July 17, 2014, hearing before the Disability Hearing Officer, Plaintiff identified a book he had read in school, described school work he had recently completed, and described the content of a magazine article he had recently read. (Tr. 115). At the November 14, 2014, administrative hearing before the ALJ, Plaintiff testified that he had ridden the bus without a problem. (Tr. 39-40). Dr. Butler testified on November 14, 2014, that she had concluded after reviewing the records that Plaintiff's impairments caused a less than marked limitation in this domain. (Tr. 64).

Although there is also evidence in the record which could support the contrary conclusion that Plaintiff's impairments caused more than a "less than marked" limitation in Acquiring and Using Information, the ALJ's decision that Plaintiff's impairments caused a less than marked limitation in this domain is nevertheless within the available "zone of choice." See, Bradley, 528 F.3d at 1115; Robinson, 956 F.2d at 838. The court may not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" Bradley, 528 F.3d at 1115; see, also, Allison v. Colvin, No. 14-04205-CV-C-DGK-SSA, 2015 WL 4475551, *5 (W.D. Mo. July 21, 2015) (utilizing "zone of choice" analysis and affirming an ALJ's finding that a minor had less than marked limitations in certain domains of functioning).

## 2. Interacting and Relating with Others

The domain of Interacting and Relating with Others includes the ability to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." See, 20 C.F.R. 416.926a(i). Specifically, adolescents should be able to relate appropriately to other children and adults, initiate and develop friendships with peers, solve conflicts with others, intelligibly express their feelings, ask for assistance, seek information, and recognize that there are different social rules for oneself, friends, acquaintances, and adults. See, 20 C.F.R. § 416.926a(i)(2)(v). Examples of limited functioning in this domain include having no close friends or friends who are all a different age than the individual, avoiding or withdrawing from known people, being overly anxious or afraid of meeting new people or trying new experiences, having difficulty playing games with rules, and having difficulty communicating. See, 20 C.F.R. § 416.926a(i)(3).

At the November 14, 2014, administrative hearing before the ALJ, Dr. Butler testified that Plaintiff's ability "'to interact and relate with others was less than markedly impaired.'" (Tr. 66). Dr. Butler explained:

> The claimant has had – and in the record at 13E is a long behavioral or disciplinary record. However in this school, in the – in the end of last year from May of 2013 – 2014, your honor, it looked as though, he had – it says, "Just two incidents or behavioral referrals, one for being disrespectful, and one for failing to follow teacher's request.["] At the end of his seventh grade school year, your honor. And then this year, thus far, again, they noted, "Just two referrals." It said, "One he left the classroom without permission." And he also – then the second one, "He grabbed a student's arm and refused to let go in doing so." So that was quite a reduction in referrals from 2013, 2012, and 2011, in which there were many more.

(Tr. 66).

Dr. Butler clarified later in her testimony that Plaintiff had three disciplinary referrals since May 1, 2014—one on May 2, 2014; one on September 30, 2014; and one on October 9, 2014—and this was the time period in which she saw a significant reduction in behavioral referrals. (Tr. 76-77).

Plaintiff has created a table for this Court which calculates and compares the number of disciplinary referrals Plaintiff received from 2008 through 2014, (1) by calendar year, (2) by school year, and (3) for only the period between May 1 and November 14 of each year. (Plf. Mem., [Docket No. 14], 28-29). No matter the calculation, however, the numbers do not render Dr. Butler's testimony inaccurate. (Id.). In calendar year 2012, Plaintiff received 17 disciplinary referrals. (Id. at 29; Tr. 335-42). In calendar year 2013, Plaintiff received 9 disciplinary referrals. (Plf. Mem., [Docket No. 14], 28; Tr. 331-35). In calendar year 2014 (through November, when Dr. Butler testified), Plaintiff received 9 disciplinary referrals. (Plf. Mem., [Docket No. 14], 28; Tr. 329-31, 423). Similarly, in the seventh grade, Plaintiff received 12 disciplinary referrals; in the eighth grade, Plaintiff received 11, and in the first 11 weeks of the 9th grade, Plaintiff had received only 2. (Plf. Mem., [Docket No. 14], 28-29; Tr. 329-42). Moreover, even comparing only the May through November 14 periods of 2012, 2013, and 2014, the number of disciplinary referrals Plaintiff received dropped from 7 in 2012 to 3 each in 2013 and 2014. (Plf. Mem., [Docket No. 14], 28-29; Tr. 66, 329, 332-33, 337-39).

The ALJ found that "there has been a decrease in [disciplinary] referrals since May 2014." (Tr. 20). As explained above, there is substantial evidence in the record as a whole to support this conclusion. Although evidence in the record might also support a different conclusion, the ALJ's decision is nevertheless again within the available "zone of choice," and

this Court may not reverse. See, Bradley, 528 F.3d at 1115; Robinson, 956 F.2d at 838; see, also, Allison, 2015 WL 4475551, at *5.

### 3.  Caring for Yourself

Plaintiff also argues that the ALJ erred in finding that Plaintiff's impairments caused less than marked limitations in Caring for Yourself, and he contends that the evidence in the record as a whole shows marked limitations in this domain. (Plf. Mem., [Docket No. 14], 27-32).

This domain addresses a child's ability to "maintain a healthy emotional and physical state," including the ability to appropriately get his or her physical and emotional wants and needs met, the ability to cope with stress and change, and whether the child takes care of his or her health, possessions, and living area. See, 20 C.F.R. § 416.926a(k). Adolescents are expected to finds appropriate ways to express their feelings. See, 20 C.F.R. § 416.926a(2)(v). Examples of limited functioning in this domain include placing inedible objects in one's mouth, using self-soothing activities such as thumbsucking or restrictive mannerisms such as headbanging, failing to dress or bathe oneself appropriately, failing to spontaneously pursue enjoyable activities, and experiencing disturbances in eating or sleeping patterns. 20 C.F.R. § 416.926a(3).

With regards to this domain, the ALJ found that Plaintiff's impairments caused less than marked limitations since May 1, 2014. (Tr. 23). Specifically, the ALJ noted the following:  Dr. Butler agreed with this assessment and that Parent's February 2014, Function Report stated that Plaintiff was able to stay out of trouble, obey rules, avoid accidents, and ask for help when needed. (Tr. 23, 296). Special Education Teacher Thuente's March 2014, Teacher Questionnaire reported that Plaintiff had problems responding appropriately to mood changes, handling frustration, using coping skills, calming himself, and asking for help, Thuente also reported that Plaintiff had no problems caring for his physical needs and taking medications. (Tr. 23, 507).

Thuente additionally opined that Plaintiff had only a slight problem using good judgment with regards to his personal safety and dangerous circumstances. (Tr. 23, 507). Thuente and Social Worker Kvamme opined in May 2014, that Plaintiff failed to take responsibility for his behavior, and Plaintiff acted out and relied on negative behavior to get out of classwork. (Tr. 23, 521). Dr. McCormack noted in a Standard Diagnostic Assessment form from an appointment in April 2014, that Plaintiff was neatly groomed, he had not been on medications since the fifth or sixth grade, and he reported sleep disturbance, but no appetite disturbance. (Tr. 23, 525, 527). Moreover, treatment notes from Counselor Chang indicated that Plaintiff "seemed to understand what he is working on but remained reluctant to work. At times, he does not think he needs to work on anything." (Tr. 24, 595). During a different session with Counselor Chang, Plaintiff asked for family time, which the ALJ concluded showed that Plaintiff had the ability to recognize his needs and respond appropriately. (Tr. 24, 594).

Finally, the ALJ stated that she

took into consideration the claimant's impairments, the medical and education records as well as the testimony and the opinion of the medical expert. . . . Ms. Thuente noted no problems caring for physical needs. There was a volitional element to his negative heavier in order to get out of work. He was only recently started on medication and no side effects were noted. He participated in the "in home" family therapy and was gaining skills. The record does not support a greater than "less than marked" limitation in this area.

(Tr. 27).

### i. School Disciplinary Referrals

With respect to the domain of Caring for Yourself, Plaintiff argues that the ALJ failed to properly consider the evidence of Plaintiff's school disciplinary referrals, which he contends shows "themes of impulsivity and emotional immaturity." (Plf. Mem, [Docket No. 14], 29). More specifically, Plaintiff contends that his "regular pattern of class disruption, disrespect, and

failure to respond appropriately to adult intervention, evidences a glaring lack of age-appropriate coping strategies and personal responsibility." (Id.). Plaintiff asserts that the disciplinary referrals, when considered in conjunction with Plaintiff's 2013 BASC-2 scores and the reports from Parent and Counselor Chang, support a finding that Plaintiff had marked limitations in this domain. (Id.).

Once again, however, even if there is some evidence in the record to support a finding that Plaintiff had marked limitations in this domain, this Court may only reverse if there is not substantial evidence supporting the ALJ's decision that Plaintiff had less than marked limitations. As long as there is substantial evidence supporting the ALJ's decision, the decision is within the available zone of choice and this Court may not reverse. See, Bradley, 528 F.3d at 1115; Allison, 2015 WL 4475551, at *5.

Although the school disciplinary referrals indicate that Plaintiff had difficulty appropriately addressing or coping with his emotional needs while at school, there was also substantial evidence in the record as a whole that Plaintiff had no difficulty taking care of his personal hygiene or caring for his physical needs. In addition to the evidence noted by the ALJ and detailed above, this Court's own review of the evidence in the record now before it shows that during the family therapy sessions in 2014, treatment notes indicate that Plaintiff was cooperative with both Parent and Counselor Chang, and Plaintiff worked on identifying his emotions and communicating them effectively (Tr. 570, 575, 578, 586). In the treatment notes from a session on May 7, 2014, Counselor Chang specifically noted that Plaintiff "appears to have low frustration tolerance, but can cooperate" and that he was able to identify his emotions and communicate his feelings to his family 7 out of 10 times. (Tr. 578). In treatment notes from a session on June 30, 2014, Counselor Chang stated that although Plaintiff was still disruptive and

disrespectful, he "seems to be gaining from skills taught for anxiety and focusing on tasks by his responses." (Tr. 593). Finally, state agency consultants Dr. Getman and Dr. Nelsen also determined that Plaintiff had less than marked limitations in this domain, and the ALJ gave the state agency consultants' opinions great weight, a decision Plaintiff does not now challenge. (Tr. 26, 516, 557).

Accordingly, the Court's review of the record as a whole shows that the ALJ's decision that as of and after May 1, 2014, Plaintiff's impairments caused less than marked limitations in the domain of Caring for Yourself was supported by substantial evidence in the record as a whole.

### ii.  March 25, 2014, Teacher Questionnaire

Next, Plaintiff argues that although the ALJ stated that she gave "great weight" to Special Education Teacher Thuente's March 25, 2014, Teacher Questionnaire, the ALJ actually gave great weight only to the portion of the Questionnaire related to Attending and Completing Tasks,[10] and the ALJ did not give sufficient weight to the portion of the Questionnaire related to Caring for Yourself. (Plf. Mem., [Docket No. 14], 30-32). Plaintiff concludes that if the ALJ had given appropriate weight to all portions of this Teacher Questionnaire, she would have found Plaintiff's impairments cause marked limitations in this domain.

The ALJ stated in her Hearing Decision:  "Great weight is given to the opinion of the claimant's teacher in the teacher questionnaire. It is supported by the objective evidence

---

[10] The Court notes that Plaintiff, in two sentences, states that "[i]n the domain of Attending and Completing Tasks the teacher rated . . . six of thirteen areas . . . as 'very serious' problems and two areas as 'serious' problems . . . . The teacher's opinion is more consistent with an extreme limitation than with the marked limitation identified in the decision." (Plf. Mem., [Docket No. 14], 31). To the extent that Plaintiff is attempting through these two sentences to challenge the ALJ's finding in the domain of Attending and Completing Tasks, the Court rejects the challenge. The Court's independent review of the record as a whole shows that substantial evidence supports the ALJ's conclusion that Plaintiff had marked limitations in the domain of Attending and Completing Tasks. The fact that Plaintiff's teacher rated six of thirteen areas about which she was asked and which related to this domain as "very serious problems" does not render the ALJ's finding unreasonable in light of the other substantial evidence in the record as a whole.

including the treatment notes and course of treatment." (Tr. 26). In her analysis of Plaintiff's functionality in the domain of Caring for Yourself, the ALJ noted, with regards to Thuente's Teacher Questionnaire:

> [Thuente] did note that [Plaintiff] has problems with calming himself, handling frustration, responding appropriately to mood changes, using coping skills and asking for help. However, he had no problems caring for his physical needs and taking medications. He would have just a slight problem using good judgment regarding personal safety and dangerous circumstances.

(Citations omitted.) (Tr. 23). The ALJ concluded that Plaintiff's impairments caused a less than marked limitation in this domain. (Tr. 22-24, 27).

A review of the Teacher Questionnaire singled out by Plaintiff shows that with regards to the domain of Caring for Yourself, Thuente reported that Plaintiff had "no problem" taking care of his personal hygiene; caring for his physical needs; or cooperating in, or being responsible for, taking needed medications. (Tr. 507). Thuente further reported only "a slight problem" with using good judgement regarding personal safety and dangerous circumstances. (Tr. 507). However, she saw "a serious problem" with Plaintiff handling his frustration appropriately, being patient when necessary, identifying and appropriately asserting his emotional needs, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. (Tr. 507). Similarly, Thuente reported that Plaintiff had "a very serious problem" responding appropriately to changes in his own mood, *e.g.* his ability to calm himself. (Tr. 507).

Plaintiff complains that the ALJ did not accurately and explicitly address the severity which Thuente reported within the domain of Caring for Yourself; for example, the ALJ stated that Thuente reported that Plaintiff had "problems with calming himself," when Thuente actually indicated that Plaintiff had "a very serious problem" doing so. (Plf. Mem., [Docket No. 14], 30;

see, also, Tr. 23, 507). Plaintiff argues that "[r]eading the decision, one would never know that more than half of the areas in the domain of Caring for Yourself are identified as 'serious' or 'very serious' problems." (Plf. Mem., [Docket No. 14], 31). Plaintiff also asserts that the ALJ did not mention in her Hearing Decision notes written by Thuente in the Questionnaire regarding this domain. (Id.).

As already set forth above, it is well-established that "[a]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig, 212 F.3d at 436. Similarly, the ALJ's reference to Thuente's reporting "problems" experienced by Plaintiff without indicating the severity of those problems, while imprecise, is not evidence that the ALJ was unaware of the severity reported by Thuente. Therefore, there is nothing in the record now before this Court that allows this Court to conclude that the ALJ improperly discounted this particular Teacher Questionnaire.

Finally, Plaintiff cites generally to the 2013 BASC-2 scores, "school records," "reports from [Plaintiff's parent] and in-home therapist,"[11] and an indication in Plaintiff's tenth-grade IEP that he was receiving special education for social skills due to his inability to properly manage classroom stress. (Plf. Mem., [Docket No. 14], 31-32). Plaintiff argues that this evidence, combined with the Teacher Questionnaire by Thuente, show that the ALJ erred in failing to assess a marked limitation in the Caring for Yourself domain. (Id. at 32).

The Court's review of the evidence in the record as a whole indicates otherwise. There is substantial evidence in the record as a whole to support the ALJ's decision that Plaintiff suffered a less-than-marked limitation in the domain of Caring for Yourself.

---

[11] The Court notes that Plaintiff does not further explain which information within these documents renders unreasonable the ALJ's determination regarding Plaintiff's limitations in this domain.

**VII.    CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.   Plaintiff's Motion for Summary Judgment, [Docket No. 13], be **DENIED;** and

2.   Defendant's Motion for Summary Judgment, [Docket No. 15], be **GRANTED.**

Dated: July 5, 2017                                                      s/Leo I. Brisbois
                                                                         The Honorable Leo I. Brisbois
                                                                         United States Magistrate Judge

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).